UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLES LIGGINS, et. al. | No. 21 CR 618<br><br>Honorable Martha M. Pacold |

**GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE*[1]**

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully moves *in limine* with respect to the following evidentiary matters.

**I.     ADMIT THE CAMTASIA COMPILATION VIDEO AS A SUMMARY EXHIBIT**

The government moves *in limine* to admit Government's Exhibit 1, the Camtasia compilation video, as a summary exhibit pursuant to Rule of Evidence 1006.

Government's Exhibit 1 is a compilation video of approximately 50 different video clips or still images from surveillance video footage, numerous Chicago Police Department (CPD) Police Observation Device (or "POD") cameras, and multiple CPD license plate readers images.[2] More specifically, the compilation video—made using a program called Camtasia— summarizes video footage from August 4, 2020 from approximately 22 different POD cameras, three different addresses on Oak Street, and approximately eight different cameras located at Parkway Gardens. It captures

---

[1] For purposes of efficiency and ease of reference, the government has filed its motions *in limine* in a single document. No single motion herein exceeds the 15-page limit as imposed by the Local Rules.

[2] This information is detailed in a CPD report, which was produced in discovery.

defendants at Parkway Gardens, their travel from Parkway Gardens to Oak Street, portions of Oak Street, the shooting, and defendants' flight after the shooting. The government intends to call the CPD officer who created the compilation video using the voluminous video footage described above, as well as the officers who collected and inventoried the different video recordings.

Rule 1006 allows the use of a "summary, chart or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Rule 1006 "requires a party seeking to introduce a summary of voluminous records to provide copies of those records to the opposing party at a reasonable time and place," which "has been understood to be such that the opposing party has adequate time to examine the records to check the accuracy of the summary." *United States v. Isaacs*, 593 F.3d 517, 527 (7th Cir. 2003) (internal citations omitted). A proponent of a summary exhibit "need only make a showing that 'the underlying records are accurate and would be admissible as evidence.'" *United States v. Shorter*, 874 F.3d 969, 978 (7th Cir. 2017) (quoting *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009)). The summary exhibit must accurately summarize the records; it may not misrepresent their contents or "make argument or inferences the jury should draw from them." *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013). Summary exhibits admitted under Rule 1006 are substantive evidence that may be taken into the jury room and the government is "not obligated to introduce the underlying documents themselves." *Id.*

The Camtasia compilation video is an appropriate summary exhibit. It provides the jury with a convenient and efficient means to review over 50 different video clips or photograph stills taken from approximately 33 different camera sources. The summary exhibit will allow the jury to conveniently examine the relevant portions (often just a few seconds) of the numerous recordings.

Defendants, through counsel, first received all the underlying video recordings, as well as the summary exhibit, in discovery on or about October 28, 2021—nearly 22 months ago. This is more than adequate time for defendants to examine the records for accuracy. *See Isaacs,* 593 F.3d at 527-38 (15 months was adequate time to review the compilation video and underlying data pursuant to Rule 1006). To date, defendants have not raised any alleged inaccuracies in the compilation video.

Defendants Liggins and Thomas object to labels and arrows applied to the compilation video that are not present in the underlying recordings. *See* Dkt. 218. Specifically, the compilation video contains labels and markings added by the CPD officer who created the compilation video to summarize the data reflected in the recordings. These labels include the location and angle of a video camera, for example "POD 7079, 6231 S. Wentworth Avenue, N/B [northbound] Wentworth from 63rd St." It also contains information about the events reflected in the underlying recordings, such as "Fusion pulls in," "driver exits" and "[a]pproximately 10 minutes later." At times, the compilation video also includes arrows pointing out the defendants or defendants' vehicles in a video or still image.

This is not improper. The information added accurately summarizes the recordings and does not include argument or inference.[3] The occasional use of arrows direct the jury to the relevant individuals or vehicles, orienting them within the video clips. Additionally, the CPD officer who created the Camtasia video using the underlying recordings (and added in the labels and arrows) will testify at trial, as will the individuals who gathered the underlying recordings. Thus, evidence of the information included in the labels and arrows will come in through witness testimony and defendants will have an opportunity to cross-examine these witnesses.

Accordingly, Government Exhibit 1 should be admitted as a summary exhibit pursuant to Federal Rule of Evidence 1006.

## II.   PRECLUDE EVIDENCE OR ARGUMENT RELATED TO PENALTIES FACED BY DEFENDANTS

The government respectfully moves this Court to preclude defendants from introducing evidence, making argument, or otherwise mentioning the potential penalties faced by defendants, if convicted.

It is well established that unless a jury has a sentencing role, such as in cases involving capital offenses, it "should be admonished to reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quotations, footnotes, and citations omitted); *see also Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000); *United States v. Lewis*, 110 F.3d 417, 422

---

[3] Defendants Liggins and Thomas specifically object to one text box that states "Subjects run out" and appears as some of the defendants run down a stairwell at Parkway Gardens. While this accurately describes the recording, the government will redact the word "Subjects" from this label in Government Exhibit 1.

(7th Cir. 1997) (noting that "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored"). For example, the Seventh Circuit has considered and rejected a request to inform a jury of a mandatory minimum penalty in a narcotics case. *See Lewis*, 110 F.3d at 422 (reasoning that the jury had no sentencing function, and no statute required the jury to be informed of the consequences of its verdict). The potential prejudice in the instant case is even higher given that the defendants face significant terms of imprisonment, if convicted. Accordingly, defendants should be precluded from arguing or introducing evidence regarding any of the ranges of penalties defendants may face if convicted.

## III. PRECLUDE EVIDENCE OR ARGUMENT RELATING TO MENTAL DEFECT, INSANITY OR PUBLIC AUTHORITY

Under the Federal Rules of Criminal Procedure, a defendant is required to provide the government with (i) notice of any defense to be raised on the basis of insanity or a mental defect inconsistent with the state of mind required for the offense charged (Rule 12.2); and (ii) notice of any defense to be raised of public authority (Rule 12.3). Because none of the defendants have notified the government or Court of their intent to raise any such defense, the government requests that they be prohibited from introducing evidence or argument of such defenses at trial without prior leave of Court.

## IV. ALLOW LIMITED EVIDENCE OF DEFENDANTS' INCARCERATION DURING THE CHARGED RACKETEERING CONSPIRACY

In a series of cases, the Seventh Circuit has repeatedly indicated that the introduction of evidence concerning the incarceration of a defendant is proper in order to provide the complete story of the case to the jury and to establish other relevant

facts. For example, in *United States v. Lashmett*, 965 F.2d 179, 184-85 (7th Cir. 1992), the defendant contacted co-conspirators from prison to employ others to execute a fraudulent scheme on his behalf. The district court ruled that evidence of the defendant's incarceration was admissible because it demonstrated the defendant's motive for utilizing others to conduct his affairs and "filled a gap in the case by explaining his absence." *Id.* at 184. The Seventh Circuit agreed and held that this information "filled a 'chronological and conceptual void' in the government's case." *Id.* at 185 (quoting *United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir. 1984); citing *United States v. Champion*, 813 F.2d 1154 (11th Cir. 1987) ("[T]he court admitted evidence of the defendant's incarceration under Rule 404(b) because it was linked together in time and circumstances with the conspiracy charged and was necessary to make the crime comprehensible to a jury.")). For these reasons, the Seventh Circuit found evidence of the defendant's incarceration was admissible. The Seventh Circuit also concluded that the introduction of this evidence was not unfairly prejudicial, because (i) the government did not call attention to the fact the defendant was incarcerated; (ii) the jury was not given the reason for the defendant's incarceration or the defendant's extensive criminal background; and (iii) a limiting instruction admonishing the jury concerning the proper use of this evidence was also given. *Id.*

Here, as discussed in the government's *Santiago* proffer (Dkt. 191 at 38), the government intends to introduce an October 14, 2021 jail call between defendant Charles Liggins and an individual believed to be Individual H, in which Liggins instructs the individual to tell "Duke" that everyone needs to get new phones, among

other statements. These statements are in furtherance of concealment of the conspiracy. As in *Lashmett*, evidence of Liggins' incarceration is admissible because it establishes the relevant facts, including his motivation for utilizing others to relay messages on his behalf. *Lashmett*, 965 F.2d at 184. Additionally, as noted in the government's 404(b) motion (Dkt. 209 at 18-19), the government intends to introduce recorded jail calls of defendant Roberson when Roberson was in Cook County custody on or about February 22 and 23, 2021, prior to defendants' arrest on these federal charges.[4] In the calls, Roberson spoke to others, including defendant Liggins, about cocaine that was missing from Roberson's stash at Parkway Gardens and the money Roberson owed Liggins and, in his conversation with Liggins, referred to Parkway Gardens as "our block." These calls are direct evidence of Roberson's and Liggins' drug trafficking activities, a purpose of the enterprise listed in the superseding indictment, and prove that Roberson and Liggins are members of the enterprise. Dkt. 120 at 2. Evidence of Roberson's period of incarceration in Cook County is relevant to provide the jury with context for the recorded calls, as well as relevant facts, including Roberson's motivation to discuss his missing cocaine with others, including Liggins.

The admission of this evidence is not unfairly prejudicial under Rule 403. The government does not intend to call attention to the fact that Liggins or Roberson were incarcerated. But the government should be able to introduce evidence as to Liggins' and Roberson's incarceration periods to provide critical context for the recorded jail

---

[4] The government may also seek to introduce additional jail calls made by the defendants during periods of incarceration, including for this case. If so, it will promptly identify those calls to the Court and defendants.

calls. Similarly, if and when the government introduces additional jail calls into evidence, the relevant defendants' periods of incarceration would also be probative. Moreover, if the Court deems it necessary, a limiting instruction can be given to prevent consideration of this evidence for any improper purpose by the jury.

Accordingly, the government seeks a pretrial ruling allowing the admission of evidence relating to defendants' incarceration periods.

## V. ADMIT STATEMENTS OF DEFENDANTS ON RECORDED CONVERSATIONS AND BAR DEFENDANTS FROM ADMITTING NON-INCULPATORY PORTIONS OF RECORDED CONVERSATIONS

As noted above and detailed in the government's *Santiago* proffer, (Dkt. 191 at 38) and 404(b) motion (Dkt. 209 at 18-19), the government intends to introduce recorded jail calls involving defendants. For the reasons provided in the *Santiago* proffer (*see* Dkt. 191 at 10-21) and 404(b) motion (Dkt. 209), statements made on these recordings are admissible as defendants' own statements, co-conspirator statements, and/or statements against penal interest, or direct evidence, and the government respectfully requests that they be admitted.

Additionally, the government anticipates that, in response to its motion and its *Santiago* proffer, defendants may seek admission of other, non-inculpatory portions of defendants' recorded conversations or jail calls. In doing so, however, defendants cannot likewise invoke Rule 801(d)(2). *See United States v. Sanjar*, 876 F.3d 725, 739 (5th Cir. 2017) ("When offered by the government, a defendant's out-of-court statements are those of a party opponent and thus not hearsay. When offered by the defense, however, such statements are hearsay . . . .") (citation omitted); *see also United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) ("[S]elf-inculpatory

statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay, but the non-self-inculpatory statements are inadmissible hearsay.") (citation omitted). A defendant "cannot admit [his] own out-of-court statements for their truth unless they qualify under an applicable exception to or exemption from the rule against hearsay." *United States v. Schultz*, No. 14 CR 467-3, R. 109 at *1 (N.D. Ill. Dec. 12, 2016). Any non-inculpatory portions of recorded conversations or jail calls offered by defendant should therefore be excluded.

"A *narrow* exception to this general rule is the doctrine of completeness," *Schultz*, No. 14 CR 467-3, R. 109 at *1, which provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." Fed. R. Evid. 106. To admit evidence under Rule 106, a court must first find "that the evidence is relevant to the issues of the case." *United States v. Reese*, 666 F.3d 1007, 1019 (7th Cir. 2012). If the evidence is relevant, the court then considers whether: "(1) the proposed evidence explains the admitted evidence; (2) the proposed evidence places the admitted evidence in context; (3) admission of the proposed evidence will avoid misleading the trier of fact; and (4) admitting the proposed evidence will insure a fair and impartial understanding of all of the evidence." *Id.*

Importantly, however, the doctrine of completeness cannot be used "to circumvent Rule 803's exclusion of hearsay testimony," *United States v. Vargas*, 689 F.3d 867, 876 (7th Cir. 2012), *abrogated on other grounds by Burton v. City of Zion*,

901 F.3d 772, 778 (7th Cir. 2018), and does not "require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Lewis*, 641 F.3d 773, 785 (7th Cir. 2011) (quoting *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982)). Although the Court must be "'sensitive to the defendant's right to present evidence on [his] own behalf, as well as [his] right not to testify,'" Rule 106 "is not an open sesame to the admission of all of [a defendant's] hearsay statements just because the Government offers some of [the defendant's] statements in its case-in-chief." *Schultz*, No. 14 CR 467-3, R. 109 at *2 (quoting *United States v. Glover*, 101 F.3d 1183, 1192 (7th Cir. 1996)). "To be admitted under Rule 106, a specific inadmissible statement must be necessary to avoid misleading the jury," and the defendant "bears the burden of showing that any additional statement clarifies or explains a specific statement offered by the Government." *Id.* For example, "inadmissible evidence may be admitted to clarify a specific inference that the admitting party can draw where the inadmissible evidence directly qualifies or negates that inference." *Id.* Similarly, "hearsay statements that change the grammatical understanding or avoid substantial distortion in the meaning of a particular admitted statement may be admitted." *Id.* On the other hand, "hearsay statements that merely further [a defendant's] 'theory' of the case, disconnected from any other admitted statement, are not admissible under Rule 106." *Id.* at *3.

To that end, should defendants seek to admit non-inculpatory portions of recorded conversations or jail calls, the government requests that this Court require defendants to "identify the specific statements that [they seek] to admit and explain

specifically how—consistent with the principles set out above—the statement is admissible under the doctrine of completeness." *Id.* at *4.

## VI.   ADMIT CRIME SCENE PHOTOGRAPHS AND VIDEO AND MEDICAL EXAMINER PHOTOGRAPHS DEPICTING VICTIM

The government moves *in limine* to admit crime scene photographs and video footage, and medical examiner photographs related to the August 4, 2020 murder of Carlton Weekly.

Crime scene photographs and videos, and medical examiner photographs "depict information valuable to the Government's case." *See United States v. Collins*, 368 F. App'x 517, 520 (5th Cir. 2010). Among other things, they "clarify oral testimony," help "illustrate the condition" of a victim's body, and, in the case of crime scene photographs, "the scene where [the victim's] body was left." *Id.* They establish "the *corpus delicti*" of the crime and "the approximate location of the [victim's] wounds." *United States v. Fleming*, 594 F.2d 598, 607-08 (7th Cir. 1979). They can also show "the identity of the victim, the manner of death, the murder weapon, or any other element of the crime." *United States v. Infelise*, 1992 WL 45023, at *1 (N.D. Ill. Feb. 5, 1992). Finally, they can "corroborate[ ] the testimony of a key government witness." *Id.*

The photographs here depict what occurred at the crime scene and to the victim, Weekly. Similarly, body-worn camera footage of responding officers and crime scene video footage captured the crime scene shortly after the shooting. While "not pleasant," these photographs and videos are highly relevant, and they corroborate statements of the witnesses, including the medical examiner as to how the murder

occurred. *See also United States v. Sheffler*, No. 19-30067, 2021 WL 5085342, at *3 (C.D. Ill. Nov. 2, 2021) (citing *United States v. Soundingsides*, 820 F.2d 1232, 1242-43 (10th Cir. 1987) (upholding admission of "undeniably gruesome" autopsy photographs that painted a clearer picture of the victim's injuries, cause of her death, and the defendant's malice aforethought)); *United States v. Briseno*, 88 F. Supp. 3d 849, 851 (N.D. Ind. 2015). They are particularly relevant to illustrate and aid in the medical examiner's testimony about Weekly's number of gunshot wounds. This evidence is relevant and probative as it provides evidence of the government's theory of the manner in which the crime was committed, including the number of shooters, defendants' motivations, and, accordingly, the identity of the defendants, in targeting the victim. *United States v. Corley*, 519 F.3d 716, 726-27 (7th Cir. 2008) (affirming district court's admission of pictures in a capital death penalty case that were "probative of the manner of death, the extent of the injuries, and the viciousness of the attack"); *see also United States v. Rezaq*, 134 F.3d 1121, 1138 (D.C. Cir. 1998) ("Autopsy photographs can have immense probative value, if for example they confirm the prosecution's theory about the manner in which the crime was committed.").

Defendants may contend that the material is not relevant and/or are unfairly prejudicial because the cause of death or fact of death is not in dispute. This common argument should be rejected. Evidence is relevant regardless of whether the issue to which it pertains is in dispute. Stated another way, the government is not limited to introduce evidence related to issues to which defendants have decided they intend to

dispute at trial. Such a rule would turn over to defendants the ability to determine what evidence the government may introduce and what evidence it may not. As *Old Chief* makes clear, defendants cannot stipulate away relevant yet prejudicial evidence. *Old Chief v. United States*, 519 U.S. 172, 189 (1997) (providing that "the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense"). Additionally, whether a defendant disputes certain evidence does not make it less relevant.

Finally, it is well-settled that "all probative evidence is prejudicial." *See, e.g., United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004). The operative question is whether evidence is *unfairly* prejudicial. *Id.* "Evidence is not to be excluded simply because it might be graphic or disturbing and if evidence is probative of an issue relevant to an element of the offense, it must be admitted in all but the most extreme cases." *United States v. Kapp*, 419 F.3d 666, 677 (7th Cir. 2005). The Seventh Circuit has noted that evidence is unduly prejudicial only "if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *United States v. Loughry*, 660 F.3d 965, 971 (7th Cir. 2011).

Here, the government's planned crime scene and medical examiner photographs and crime scene video footage are highly probative. They constitute direct evidence of the charged crime and corroborate anticipated testimony from government witnesses who will describe how the murder occurred. For example, as discussed above, the medical examiner photographs provide probative evidence of the

manner in which Weekly was murdered. Additionally, as an example, as detailed in its *Santiago* proffer (Dkt. 191 at 20), the government intends to introduce surveillance video that captured defendant Turpin stand across Oak Street from Weekly for several minutes until Weekly was murdered and then walk over toward Weekly to get a better look at Weekly after the shooting. Crime scene photographs and body-worn camera footage depicting the scene of Weekly's murder, as well as its location on Oak Street provide probative evidence to the jury about Turpin's location and view of Weekly after the shooting. Similarly, the photographs and video footage may corroborate other eye witness testimony about the crime, including the shooting victims (Victims 1 and 2). Importantly, the government will not introduce all of the crime scene or medical examiner photographs or crime scene video footage, nor will it introduce photographs or video clips that are duplicative of each other. Rather, the government will select a subset of photographs and video clips to introduce related to the crime scene, which will assist the jury in assessing the credibility of the witnesses and the reliability of their testimonies.

## VII. ADMIT RECORDS AS SELF-AUTHENTICATING PURSUANT TO RULES 803(6), 902(11), AND 902(13)

The government moves for a determination that (1) certain business records are admissible pursuant to Federal Rules of Evidence 803(6) and 902(11); and (2) information provided by Facebook, owned by Meta Platforms Inc., has been properly authenticated pursuant to Federal Rule of Evidence 902(13).

Under Rule 902(11), certified copies of domestic business records are self-authenticating if the party offering the records provides the adverse party written

notice and allows the adverse party to inspect the exhibit and certification, allowing the party to challenge the authenticity of the records. Under Rule 803(6), the records are an exception to the hearsay rule if following conditions exist:

> (A) the records was made at or near the time by—or from information transmitted by—someone with knowledge;

> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

> (C) making the record was a regular practice of that activity;

> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

> (E) the opponent does not show that the source of the information nor the method or circumstances of preparation indicate a lack of trustworthiness.

The Seventh Circuit has consistently upheld the admission of business records through business records certifications, pursuant to Rules 803(6) and 902(11). *See, e.g., United States v. Green*, 648 F.3d 569, 580-81 (7th Cir. 2011); *United States v. Klinzing*, 315 F.3d 803, 809-10 (7th Cir. 2003) (holding that admission of pre-certified business records under Rules 803(6) and 901(11) does not violate the Confrontation Clause because the records have "sufficient guarantees of reliability"); (*United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (Seventh Circuit upheld the admissibility records through the use of Rule 902(11) certifications in light of *Crawford*)).

The government moves the Court to find, pursuant to Federal Rule of Evidence 104, that the records summarized below are authentic business records within the meaning of Rule 803(6). Rule 104 authorizes the Court to determine in advance of trial "[p]reliminary questions concerning the qualification of a person to

be a witness, the existence of a privilege, or the admissibility of evidence." This rule applies to all preliminary determinations, including the question of whether documents fall within the "business records exception" to the hearsay rule. *See United States v. Kasvin*, 757 F.2d 887, 893 (7th Cir. 1985) (affirming trial court's preliminary determination pursuant to Rule 104 that business records were admissible pursuant to Rule 803(6)).

Through this motion, the government provides notice of its intention to introduce the following business records for which it will rely on business records certifications under Rules 803(6) and 902(11):

| Business Entity | Business Records |
|---|---|
| AT&T | Call Detail Records and Subscriber Information for (773) XXX-8305 |
| Cook County Medical Examiner | Weekly Medical Examiner Records |
| Meta Platforms, Inc. (Facebook and Instagram) | Facebook and Instagram account records |

At trial, the government intends to introduce selected portions of the business records identified in the foregoing chart. Copies of each of the business records certifications that the government has received for these records are attached as Exhibit A to this motion. The underlying business records have all previously been produced to defendant in discovery. Admission of these documents through 902(11) certification will save the Court, the jury, and the parties significant time and resources by limiting the number of witnesses that the government needs to call in its case-in-chief.

The government reserve the right to supplement its notice with additional

business records certifications.[5]

In addition to being admissible as business records under Rule 803(6) and 902(11), the Meta records are admissible as authentic records generated by an electronic process or system under Rule 902(13).[6] As set forth in the attached certifications, the records produced by Meta in response to the search warrants are "an exact copy of the records that were made and kept by the automated systems of Meta in the course of regularly conducted activity as a regular practice of Meta. The records were saved in electronic format after searching Meta's automated systems" in response to the search warrant. In addition, "[t]he records were made at or near the time the information was transmitted by the Meta user." Ex. A.

The Meta / Facebook certifications establish that their records are generated by an electronic process that produces an accurate result, as required by Rule 902(13). *See, e.g., United States v. Forty-Febres*, 2018 WL 2182653, at *1 (D.P.R. May 11, 2018) (admitting electronic vehicle registration records "as copies of an accurate search results from an electronic database under 902(13)"). As with the business records, this pretrial motion and the production of the records and certifications in

---

[5] The government will provide defendants with any additional certification as they are received or relevant, and the Seventh Circuit has allowed notice to be provided only days before trial. *See United States v. Bledsoe*, 70 Fed. Appx. 370, 373 (7th Cir. 2003) (Seventh Circuit upheld the admission of business records pursuant to 902(11) certifications even though the government gave defendant notice of its intent to use the certification only four days prior to trial).

[6] Meta Platforms, Inc. was formerly known as Facebook, Inc.. Facebook, Inc. became Meta Platforms, Inc. on or about October 28, 2021. *See* https://about.fb.com/news/2021/10/facebook-company-is-now-meta/ (last visited August 25, 2023). The government received some records prior to the name change and accordingly, those certifications are from Facebook, Inc.

discovery constitutes compliance with the notice and opportunity to inspect provisions of Rule 902(13). Therefore, Rule 902(13) provides an additional, independent business for the authentication of Facebook records.

## VIII. ADMIT WEEKLY'S STATEMENTS AS DYING DECLARATIONS AND/OR EXCITED UTTERANCES, STATEMENTS OF THEN-EXISTING PHYSICAL CONDITION, AND STATEMENTS FOR MEDICAL TREATMENT

At trial, the government intends to introduce Weekly's statements to a Chicago Police Department officer rendering him aid after he was shot.

Specifically, the government intends to introduce body-worn camera footage from a CPD officer who responded to the shooting and attempted to render first aid to Weekly as he lay on the street after he was shot multiple times.[7] The officer's body-worn camera captured Weekly's statements to the officer. After the officer asked Weekly where he was "hit", Weekly responded "everywhere" and, when the officer asked again, Weekly repeated, "everywhere, I can't feel…." Approximately two minutes later, the officer told Weekly to "keep breathing" and Weekly responded "help me." The officer said that EMS was coming and Weekly responded "help me." Evidence at trial will prove defendant had sixteen total gunshot wounds, including gunshot wounds to his head, neck, chest, and back, and suffered from multiple internal injuries.

Pursuant to Federal Rule of Evidence 804(b)(2), in a homicide prosecution, a statement under the belief of imminent death, or a "dying declaration," is an exception to the rule against hearsay when the declarant is unavailable as a witness.

---

[7] Defendants have received this video footage in discovery.

A dying declaration is "a statement that the declarant, while believing the declarant's death to be imminent, made about its causes or circumstances." Fed. R. Evid. 804(b)(2). "The declarant must have spoken without hope of recovery and in the shadow of impending death" and "with the consciousness of a swift and certain doom." *Shepard v. United States*, 290 U.S. 96, 99-100 (1933); *see also Webb v. Lane*, 922 F.2d 390, 395–96 (7th Cir. 1991) ("[T]he declarant must believe that death is imminent at the time he makes the statement"). A declarant's "[d]espair of recovery may indeed be gathered from the circumstances," *Shepard,* 290 U.S. at 100, and "the Supreme Court has long held that a declarant's sense of impending death may be inferred 'from the nature and extent of the wounds inflicted being obviously such that he must have felt or known he could not survive.'" *Webb,* 922 F.2d at 395 (quoting *Mattox v. United States,* 146 U.S. 140, 151 (1892)); *see also United States v. Mobley,* 421 F.2d 345, 347 (5th Cir. 1970) (court looked at the gravity of declarant's wounds in determining his awareness of death). Rule 804(a)(4) defines unavailability of a witness to include a witness who cannot be present testify at trial "because of death." Fed. R. Evid. 804.

Here, Weekly's statements about the location of his injuries and his pleas for help relate to the cause and circumstances of his imminent death. Fed. R. Evid. 804(b)(2).[8] Weekly's sense of impending death is inferred from the severity and extent of his injuries: sixteen gunshot wounds, including gunshot wounds to his

---

[8] As an initial matter, defendant's pleas for help are not hearsay because "a command is not an assertion of fact." *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011). However, even assuming they were, they nonetheless are subject to the hearsay exceptions stated herein.

head, neck, and torso, and significant internal injuries. *See Webb,* 922 F.2d at 396 (inferring declarant knew about the seriousness of his condition based on his six gunshot wounds and internal injuries). Accordingly, these statements are admissible as dying declarations pursuant to Rule 804(b)(2).

Alternatively, Weekly's statements are also admissible as excited utterances under Rule 803(2). A hearsay exception applies to statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The exception is premised upon the belief that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." Fed. R. Evid. 803 Advisory Committee's Note. For a statement to qualify as an excited utterance: "(1) a startling event must have occurred; (2) the declarant must make the statement under the stress of the excitement caused by the startling event; and (3) the declarant's statement [must] relate[ ] to the startling event." *United States v. Zuniga*, 767 F.3d 712, 716 (7th Cir. 2014). Weekly's statements occurred minutes after he was shot sixteen times, an undeniably startling event. Both his statements about where he was shot ("everywhere") and his pleas for help related to that startling event, and thus qualify as excited utterances under Rule 803(2).

The statements also qualify under other exceptions to the hearsay rule. For example, Weekly's statements that he was shot "everywhere" and "can't feel" are admissible under the Federal Rule of Evidence 803(3) as statements of defendant's then-existing physical condition. Rule 803(3) excludes statements of then-existing

physical condition, including "pain, or bodily health" from the rule against hearsay. Fed. R. Evid. 803(3). Additionally, pursuant to Federal Rule of Evidence 803(4), Weekly's statements about the location of his injuries and his pleas for help to the officer rendering first aid also constitute statements made for the purpose of medical diagnosis or treatment. Fed. R. Evid. 803(4). Pursuant to Rule 803(4), a statement that "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment;" and (B) describes, among other things, "present symptoms or sensations" is excluded from the rule of hearsay. Fed. R. Evid. 803(4).

Weekly's statements are relevant and probative evidence under Federal Rule of Evidence 401. His statements are evidence of the crime itself as well as the extent of his injuries, and the manner and viciousness of his murder. *Corley*, 519 F.3d at 726-27; *see also Sheffler*, No. 19-30067, 2021 WL 5085342, at *4. Additionally, the statement that he was shot "everywhere" is evidence supporting the government's theory of the manner of death, namely that multiple shooters targeted Weekly and fired numerous rounds in an effort to kill him as a high-target opposition gang member. This evidence is relevant and probative as to the number of shooters, the identity of defendants, and their motivations to target and murder Weekly. Notably, the government does not intend to show the officer's entire body-worn camera footage, which captured some of Weekly's serious injuries and his obvious suffering after the shooting. Rather, the government seeks to introduce limited portions of the footage, totaling approximately 30 seconds, that capture Weekly's statements. While this footage also depicts blood and some of Weekly's injuries, as set forth above

(*supra* pp. 11-14), this type of crime scene evidence is not unduly prejudicial.

Accordingly, Weekly's statements as captured in portions of body-worn camera footage should be admitted.

## IX. BAR DISCOVERY REQUESTS OR COMMENTS REGARDING DISCOVERY IN THE JURY'S PRESENCE

The government moves this Court to preclude the parties from requesting discovery from witnesses or opposing counsel, moving the Court for such discovery, or otherwise commenting on discovery matters, in the presence of the jury.

Such requests in front of the jury may distract the jury or create the impression that one side has suppressed information as a means of seeking an unfair advantage. *See, e.g.*, *United States v. Gray*, 2010 WL 1258169, *3 (N.D. Ind. Mar. 26, 2010) (granting government's motion to preclude the defense from requesting or commenting on discovery in the presence of the jury); *see also Thompson v. Glenmede Trust Co.*, No. Civ. 92–5233, 1996 WL 529693 (E.D. Pa. Sept. 17, 1996) ("Rather than focus on the issues in the case, the jury may instead be misled by the irrelevant side issues of the discovery process. Therefore, the Court will not permit either party to refer to the discovery process in the presence of the jury at trial."). As such, the government asks this Court to prohibit either party from raising discovery issues in the presence of the jury. The appropriate time to raise such issues would be at a sidebar or while the jury is not in the courtroom.

## X.  PRECLUDE EVIDENCE AND ARGUMENT ABOUT INVESTIGATIVE STEPS NOT TAKEN

The government expects defendants to raise questions on cross-examination about investigative steps not taken, for example, the fact that certain potential witnesses were not interviewed.

As a general matter, "[t]he district court retains wide latitude in limiting the extent and scope of cross-examination 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Robbins*, 197 F.3d 829, 845 (7th Cir. 1999) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). It is well within a district court's discretion to preclude defendant's counsel from questioning witnesses about investigative steps not taken. *See United States v. Zaccaria*, 240 F.3d 75, 81 (1st Cir. 2001) ("In the absence of a particularized showing that the government was not turning square corners, the district court acted well within its discretion in refusing to let defense counsel embark on a fishing expedition."). A defendant may not put the government on trial by arguing that there was something more the government could have done to investigate the case when, as here, the defendant has not made any connection between an allegedly shoddy or slanted investigation and any evidence introduced at trial or a specific defense. *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998), *cert. denied*, 526 U.S. 1007 (1999), *disapproved of on other grounds by Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999).

In *Robbins*, the defendant argued that the district court abused its discretion in limiting cross-examination of an agent "about the extent of the investigation," specifically sustaining an objection to defense counsel's question whether the agent "investigated the length of time that [a co-defendant] and Gordon Robbins had known each other." 197 F.3d at 845. In particular, the district court ruled:

> [I]t is not my intention to allow this trial to become a trial of the investigation. And it is my intention that the jury make its decision based on evidence actually presented rather than the—than speculation about the possible existence of other evidence that might have been developed if the investigation had been carried out in some other way.

*Id.* (citation omitted; alteration in original). On appeal, Robbins argued that the "quality and thoroughness of the investigation by law enforcement agents was an appropriate area of cross-examination," whereas the government contended that defendants simply intended to "impugn the thoroughness of that investigation in order to demonstrate that people other than the defendants were responsible for the crime and that law enforcement was either aware of, or ignored, evidence to that effect." *Id.* The Seventh Circuit found no abuse of discretion. While noting the district court's perception that the disputed line-of-questioning might confuse the jury and cause it to speculate about evidence not before the jury, which the Seventh Circuit deemed "valid reason[s]," it further noted the "marginal relevance" of the information. *Robbins*, 197 F.3d at 845. In the same way here, any line-of-questioning intended to try the investigation carries "marginal relevance" and merely works to confuse the jury and imply that additional evidence exists that has not been presented to the jury. Such evidence should be excluded.

In *McVeigh*, moreover, the district court precluded the defendant from introducing evidence related to reports pertaining to the activities of the "Elohim City group," another potential suspect according to the defendant, which showed a "shoddy" and "slanted" investigation. 153 F.3d at 1192. The Tenth Circuit affirmed, dismissing the argument factually and legally. As to the latter, the court rejected the idea that the "quality of the government's investigation was material to his defense." *Id.* It held that although the "quality or bias of a criminal investigation occasionally may affect the reliability of particular evidence in a trial," this is true where the defendant can establish a connection between the omitted investigative steps and actual evidence introduced at trial, such as an argument about an improper chain of custody. *Id.* ("There was no trial evidence whose reliability would have been undercut . . . To have allowed McVeigh to put the government on trial because there might have been something more the government perhaps could have done . . . would inevitably divert the jury's attention from the issues of the trial."). There, the defendant failed to establish the requisite connection between the alleged "shoddy" investigation and the evidence introduced at trial. *Id. McVeigh* supports the proposition that such a direct connection between the steps not taken and the evidence is required before a defendant runs roughshod over the government's investigation.

Evidence elicited to support a broad claim that the government's investigation of the case was sloppy or inadequate is also irrelevant. The question for the jury is not to determine whether the government's investigation was good or bad; it is

whether the defendants are guilty or not guilty. In *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994), the Sixth Circuit rejected an argument as to the relevancy of certain steps that the government had not taken during an investigation, reasoning that "[t]his evidence was offered to show that the government's investigation of the case had been, as the defendant put it, 'sloppy.'" *Id.* (precluding defendant from submitting evidence that the government originally miscalculated the number of bogus prescriptions in a prosecution for possession and illegal distribution of controlled substances and failure to keep proper records). The district court ruled, and the Sixth Circuit affirmed, that the evidence was irrelevant and "noted that the jury would not be called upon to determine whether the government's investigation had been good or bad." *Id.*

Applied here, general allegations that the investigating agencies and agents could have done things differently are inadmissible and irrelevant. In *Zaccaria,* for example, the First Circuit upheld the district court's refusal to allow the defendant to question a Secret Service agent about the government's non-administration of a polygraph examination. The defendant argued that the proposed interrogation was "designed to show that the government was somehow playing fast and loose . . . by unfairly protecting its witnesses, currying favor with them, or tolerating their evasiveness." 240 F.3d at 81. The First Circuit, however, found that "that surmise requires much too attenuated a chain of inference." *Id.* The Court further explained how the decision not to administer a polygraph has many explanations:

> For example, the fact that polygraph tests ultimately were not administered could be attributable to any number of reasons (e.g., administrative oversight, lack of time, lack of resources, the personal proclivities of a specific agent, knowledge that the test results would be inadmissible at trial, and so on and so forth). Many (perhaps most) of these possible reasons have no bearing either on the government's bona fides or on the issues in this case.

*Id.* That same reasoning applies here as well. A law enforcement officer's not to interview a particular witness or not to take other action has multiple explanations, not simply that the officer was hiding something or is lying, which is what defendants may seek to imply. Without a connection to the evidence in the case, this line of inquiry serves no other purpose than to divert the jury's attention from the actual evidence in the case by trying the investigation, which is improper.

Furthermore, even if evidence of investigative steps not taken has some minimal probative value, the evidence should nonetheless be barred under Rule 403 because of the danger of unfair prejudice and jury confusion. *United States v. Patrick,* 248 F.3d 11, 23 (1st Cir. 2001), *cert. denied,* 534 U.S. 1043 (2001) *and* 535 U.S. 910 (2002) ("Such speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against [the defendant] to accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that 'substantially outweighed' the evidence's probative value."); *see also Zaccaria,* 240 F.3d at 81 ("Testimony about the government's non-administration of polygraph examinations would be apt to spark an unwarranted and profoundly prejudicial inference that the Secret Service agents believed the test results would be harmful to their case . . . . The substantial likelihood of unfair prejudice associated

27

with this line of questioning, combined with the speculative nature of the appellant's bias theory, convinces us that foreclosing the inquiry entailed no abuse of discretion."). Unless defendants connect such a line-of-questioning regarding the investigation with other evidence in the case or with a specific defense, it carries limited probative value but the risk of substantial prejudice. Additionally, while *McVeigh* excluded specific claims against another suspect, general and non-specific claims that law enforcement could have done things differently—such as interviewing a potential witness or taking some other investigatory step—are even further removed from the realm of relevant evidence. Any attempt by the defendant to shift the spotlight to efforts the government could have taken in the investigation inevitably wastes time and diverts the jury's attention from the issue of guilt for the jury to decide at trial. *McVeigh*, 153 F.3d at 1192.

Without a reasonable and specific connection to the evidence introduced at trial, as opposed to general claims that the agents and officers could have done things differently, any line of questioning intended to put the investigation on trial should be excluded.

## XI.  EXCLUDE NON-IDENTIFICATION HEARSAY EVIDENCE

The government moves to exclude any questioning of law enforcement officers related to non-identifications on photographic arrays or identifications of third parties where the person making the identification has not testified. Under Federal Rule of Evidence 801(d)(1)(C), an out-of-court identification is not hearsay, and thus admissible, only where the declarant testifies and is subject to cross-examination about the prior statement, and the prior statement identifies a person as someone the

declarant perceived earlier. If, however, the declarant who made the identification does not testify, the out-of-court identification is not admissible.

In *United States v. Harris*, 281 F.3d 667 (7th Cir. 2002), the defendant called as a witness a detective who was present at a line-up, and tried to ask the detective about two witnesses who did not identify the defendant. The Seventh Circuit affirmed the preclusion of such testimony. The Court of Appeals described the defendant's attempted line of questioning as a "backdoor attempt to submit second-hand (and unchallengeable) evidence suggesting that [the defendant] may not have been the person they saw who robbed the bank." *Id.* at 671-72. It further noted that the defendant could have called the two witnesses to testify but declined to do so, which curtailed the government's ability to cross-examine them as to why they did not make an identification. *Id.* at 672.

The same holds true here. If defendants seek to admit an out-of-court identification or non-identification pursuant to Rule 801(d)(1)(C), they must call the witness; they may not admit the identification or non-identification through the law enforcement officer who administered the identification procedure.

## XII. BAR IMPROPER USE OF AGENTS AND OFFICERS' REPORTS

The government respectfully requests a pretrial ruling that interview summaries prepared by the FBI, CPD reports describing witness statements, and interview reports by other law enforcement agencies are not statements of the person being interviewed, and furthers asks the Court to preclude defendants from introducing the contents of such reports to impeach witnesses during cross

examination, or otherwise suggesting to the jury that the reports are statements of the witnesses who did not write or adopt them.

The Jencks Act requires that, after a government witness testifies on direct examination, the government must provide the defense with any statements made by the witness that relate to the subject of his or her testimony. *See* 18 U.S.C. § 3500. The government has turned over, and will continue to turn over on a rolling basis, statements of potential witnesses. The Jencks Act defines a statement as "a written statement made by said witness and signed or otherwise adopted or approved by him," a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously," or a statement made by a witness to the grand jury. *See* 18 U.S.C. § 3500(e).

In *Palermo v. United States*, 360 U.S. 343 (1959), the Supreme Court held that, because the Jencks Act is meant to restrict the defendant's use of discoverable statements for impeachment, "only those statements which could properly be called the witness' own words should be made available to the defense." *Id.* at 349, 352. The Court explained that "summaries of an oral statement which evidence substantial selection of material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced." *Id.* at 352-53. Consistent with *Palermo*, the reports identified above are not witness statements of the *interviewees* discoverable under the Jencks Act. *See United States v. Morris*, 957 F.2d 1391, 1402 (7th Cir. 1992) ("[T]he documents are not statements producible under the Jencks Act because they were neither signed nor adopted . . . and further because they are not a verbatim

recital . . . but rather only an agent's summary."). Unless the witnesses have reviewed and adopted the reports—which was not the practice in this case—the reports cannot qualify as statements covered by § 3500(e)(1). Moreover, in general, the reports were finished after interviews were completed; they do not constitute a contemporaneous and substantially verbatim recital of the witness's statement under § 3500(e)(2).

Although production of the reports was not required, the government has produced the great majority of such reports well in advance of trial and will continue to do so. In this circumstance, the defense should be limited to using the reports consistent with the law and rules of evidence. In particular, the defense must be precluded from introducing the contents of the reports to impeach witnesses on the basis of inconsistent statements, because the reports are not the statements of the witnesses being interviewed. Moreover, the defense must be precluded from publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of the witness and that those statements, for example, contain inconsistencies. To allow otherwise would subvert the meaning of the Jencks Act and the Supreme Court's decision in *Palermo*, holding that it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." 360 U.S. at 350.

The government acknowledges that the defense may ask a witness whether he or she made a statement that is reflected in a report. However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the

report's contents as a prior inconsistent statement. *See United States v. Brika*, 416 F.3d 514, 529 (6th Cir. 2005) ("such documents [FBI 302s] have been deemed inadmissible for impeaching witnesses on cross-examination"), *abrogated on other grounds by United States v. Booker*, 543 U.S. 222 (2005); *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement"). Moreover, the defense may not use the reporting in a way that suggests to the jury that the reporting is a witness's statement. *See United States v. Marks*, 816 F.2d 1207, 1210-11 (7th Cir. 1987) (holding that where defense counsel read from an agent report during cross-examination in a way that would "seem authoritative" and potentially confuse the jury, the judge was entitled to require the witness be shown the report and given the opportunity to adopt or reject it as a statement, although such a practice was no longer required by the Federal Rules of Evidence).

## XIII. Preclude Inquiry into Officers/Agents' Non-Sustained Complaints[9]

The government anticipates calling witnesses at trial who are current and former officers employed by law enforcement agencies. In preparation for their testimony, and in accordance with the government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), the government is in the process of requesting disciplinary records from law enforcement agencies related to its potential witnesses. These records may contain a list of administrative complaints filed against officers for alleged misconduct.

Evidence of any complaints resolved in a manner favorable to the involved officer do not constitute admissible impeachment material within the meaning of *Giglio*, fall outside the scope of proper cross-examination under Federal Rule of Evidence 608, and should otherwise be excluded under Rule 403. As such, the government respectfully requests that this Court preclude reference to such non-sustained complaints at trial.

---

[9] This motion in *limine* addresses only non-sustained complaints or allegations against law enforcement witnesses, that is, complaints that resulted in findings such as not sustained, unfounded, exonerated, etc. This motion does not address sustained complaints. The government is not in a position to litigate sustained complaints against law enforcement officers at this time because it has not yet made final decisions as to which law enforcement officers it will call as witnesses at trial and it has not yet received all documents related to any such sustained complaints. The government instead will disclose sustained complaints to defense counsel closer to trial and attempt to resolve the admissibility of each sustained complaint with defense counsel without the Court's involvement. If the parties cannot resolve the admissibility of such a sustained complaint, the government proposes addressing sustained complaints closer to trial, or during trial and immediately before the relevant witness testifies. If any sustained complaint calls for a separate motion *in limine*, the government will request leave of the Court to do so.

Under Federal Rule of Evidence 608(b), a witness' character for truthfulness may be impeached by specific instances of prior conduct only "if they are probative to the [witness'] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b). Moreover, it is within the Court's discretion to permit or exclude such cross-examination because "the possibilities of abuse are substantial," and conduct "must be sufficiently relevant to truthfulness before it can be the subject of cross-examination." *See United States v. Abair*, 746 F.3d 260, 263 (7th Cir. 2014); *United States v. Dawson*, 434 F.3d 956, 959 (7th Cir. 2006). "). In fact, in *Holt*, 486 at 1002, the Seventh Circuit held that an officer's *sustained* complaint for "neglect of duty" was not probative of truthfulness under Rule 608(b) and, therefore, the district court did not err in precluding cross-examination of the officers. If a sustained complaint is not relevant "because it did not bear on [the officers'] characters for truthfulness" or credibility, a non-sustained complaint must equally fail. *Id.*; *see also United States v. Hernandez*, 84 F.3d 931, 933-34 (7th Cir. 1996) (providing that the district court did not err in barring cross-examination of a police officer regarding past civil rights suit because it was irrelevant to the officer's general credibility and could unfairly prejudice the jury); *United States v. Goodwin*, No. 02 CR 980, 2003 WL 21266681, at *1 (N.D. Ill. June 2, 2003) (Kennelly, J.) (rejecting in a post-trial motion that the defendant "should have been allowed to cross-examine Chicago Police Officer [], a government witness, regarding a complaint involving a prior arrest of another individual. The matter had no bearing on [the witness's] credibility.").

Unproven allegations are not probative of anything, let alone untruthfulness.

*United States v. Morrison*, 98 F.3d 619, 628 (7th Cir. 1996) (affirming district court ruling that the "mere filing of a complaint . . . regardless of whether the allegations in the complaint [were] true," does not meet the requirement that cross-examination be confined to conduct that is "probative of truthfulness or untruthfulness"). In a parallel context, it is well established that "a witness's credibility may not be impeached by evidence of his or her prior arrests, accusations, or charges." *Barber v. City of Chicago*, 725 F.3d 702, 709 (7th Cir. 2013) (collecting cases). This is because, "[u]nlike a criminal conviction, an *arrest* is not, in itself, probative of the arrested person's character for truthfulness." *Nelson v. City of Chicago*, 810 F.3d 1061, 1068 (7th Cir. 2016); *Michelson v. United States,* 335 U.S. 469, 482 (1948) ("Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty.").

The same can be said for non-sustained officer complaints, which should also be inadmissible under Rule 403 because they would be unfairly prejudicial to an officer witness, confuse the issues, and needlessly delay the proceedings. If the Court allowed inquiry into non-sustained complaints at trial, the government would be forced to provide the impacted officer with an opportunity to either contest or explain the underlying circumstances. This would exponentially extend the examination of each law enforcement witness.

Accordingly, any non-sustained complaints against police officers are not admissible. Such allegations are only that—allegations—and not material to a witness's credibility. Likewise, these allegations that end in favorable results for the

officers are not probative of truthfulness, and even if they were, the prejudicial effect from their admission substantially outweighs their limited probative value.

## XIV. ADMIT LAY OPINION TESTIMONY OF AGENTS AND OFFICERS RELATED TO THE IDENTIFICATION OF PEOPLE AND PLACES IN IMAGES, VIDEOS AND RECORDED CONVERSATIONS

The government moves *in limine* to offer lay opinion testimony from agents and officers regarding the identification of people and places in social media posts, images, and videos to be introduced at trial. As detailed in the government's *Santiago* proffer (Dkt. 191 at 42-46, 48-56), the government intends to introduce images and videos of some of the defendants as evidence of their membership or association with the O-Block enterprise. At least one FBI agent will testify to identify the persons and places in certain photographs and videos based on their personal knowledge of the defendants and other individuals. Additionally, an FBI agent will likely testify to identify the voices of defendants in recorded jail calls based on his or her personal knowledge.

For the opinion of a lay witness to be admitted under Federal Rule of Evidence 701 ("Rule 701"), it must be "rationally based on the witness's perception; helpful to clearly understanding the witness's testimony or to determining a fact in issue; and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Lay witness opinion testimony is "a summary of first-hand sensory observations," as opposed to expert opinion, which is

based on specialized knowledge. *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002).[10]

Here, the government will establish a personal knowledge requirement "limited to that officer's observations or other facts derived exclusively from a particular investigation." *United States v. Malagon*, 964 F.3d 657, 662 (7th Cir. 2020). The testifying FBI agents have been involved in the instant investigation for a significant period of time, and the government will establish a sufficient foundation to allow them to identify participants in social media images and videos based on their first-hand knowledge over the course of this investigation. They are familiar with the defendants and their associates, and they are also familiar with appearances and voices of the defendants and their associates. In this way, and as further detailed below, their testimony will be based on their personal perceptions and observations.

More specifically, the agents will identify the persons in recorded conversations and in photographs and videos based on their first-hand observations in this investigation, including, for example, conducting surveillance, interviewing the defendants and their associates, reviewing discovery, and reviewing recorded jail

---

[10] Unlike in *United States v. Jett*, 908 F.3d 252 (7th Cir. 2018)—where the Seventh Circuit found no reversible error in the district court allowing a case agent's testimony about his interpretation of defendants' text message slang as *expert testimony* under Federal Rule of Evidence 702—the government here intends only to introduce the FBI agents' interpretation of social media records and recorded calls as *lay testimony*, based on the agents' personal knowledge and first-hand observations in this investigation. *See United States v. Cheek*, 740 F.3d 440, 447 (7th Cir. 2014) ("When a law enforcement officer testifies about the meaning of drug code words used by defendants based on personal knowledge obtained from the investigation of those defendants, the officer is testifying as a lay witness."). To that end, any agent testimony offered as to interpretations of social media photographs and conversation dialogue will be limited to the confines of Federal Rule of Evidence 701.

37

calls, photographs and videos from social media.[11] They may also identify the places depicted in some images based on their personal knowledge. This is proper. *See United States v. Jackson*, 688 F.2d 1121, 1125 (7th Cir. 1982) (allowing identification testimony of a witness in a bank robbery under Rule 701 and explaining that "[t]he amount of time that the witness had to observe the defendant goes to the weight to be accorded to the testimony by the jury rather than to its admissibility"); *United States v. Earls*, 704 F.3d 466, 473 (7th Cir. 2012) (providing that lay identification testimony of two agents that the defendant was the person depicted in a passport application was harmless error because "[n]either man had ever met [the defendant] prior to trial"). Unlike in *Earls*, the testifying agents are familiar with the appearance of defendants, other O-Block members, and their associates, and Parkway Gardens through, among other things, first-hand observations over several years in the context of this investigation.

For these reasons, the government respectfully requests that the Court admit lay opinion testimony from FBI agents regarding the identification of individuals in recorded conversations and social media data.

## XV. PRECLUDE CROSS-EXAMINATION REGARDING ARRESTS AND OTHER "BAD ACTS" OF WITNESSES

The government moves to exclude any cross-examination of a government witness regarding prior arrests that did not result in any conviction, or any "bad act" of a witness unrelated to truthfulness.

---

[11] With respect to the social media photographs to be introduced at trial, the government obtained them by search warrant or open-source search.

Courts have appropriately taken a negative view of questioning a witness regarding an arrest. "Prior arrests are unproven charges that are inadmissible, irrelevant and highly prejudicial." *Fletcher v. Conway*, 1991 WL 24460, at *2 (N.D. Ill. Feb. 21, 1991); *see also Cruz v. Safford*, 579 F.3d 840, 845 (7th Cir. 2009) (finding that the district court did not abuse its discretion by excluding evidence of seven prior arrests because "seven arrests and one battery conviction were not credibility matters, but highly prejudicial"); *Anderson v. Sternes*, 243 F.3d 1049, 1054 (7th Cir. 2001) (providing that "[t]he law is clear that a defendant's prior arrest record is inadmissible. . . ."). The fact that a witness was charged with, but not convicted of, a crime has no bearing on a witness's credibility. Indeed, the mere fact of an arrest unrelated to truthfulness, without a subsequent conviction, does not prove anything at all. In addition to an arrest's low probative value, it also carries a great potential for prejudice.

Evidence of a prior arrest should be precluded in accordance with the strictures of Federal Rules of Evidence 609 and 608. Rule 609 allows for the admission of a witness's "criminal conviction" for purposes of impeachment under certain specified circumstances. Fed. R. Evid. 609. By its express terms, Rule 609 permits evidence only of convictions, not arrests. Nor are arrests admissible under Rule 608(b), which provides that specific instances of past conduct may be inquired into on cross-examination if, and only if, they concern the witness's character for truthfulness. Courts have not construed Rule 608(b) to permit cross-examination on prior arrests absent special facts bearing on the witness's character for the specific trait of

truthfulness. Unless a defendant can demonstrate that the conduct underlying the arrest implicates a witness's character for truthfulness, he should be precluded from inquiring into the conduct on cross-examination. *See United States v. Smith*, 2008 WL 11438034, at *3 (N.D. Ill. Jan. 23, 2008), *aff'd sub nom. United States v. Ajijola*, 584 F.3d 763 (7th Cir. 2009) (granting the government's motion "to preclude Defendants from impeaching witnesses based on prior arrests that did not lead to convictions and did not concern crimes that tend to show the dishonesty of the witness" because the motion *in limine* was "strictly in accordance with the Federal Rules of Evidence").

Similar to an arrest, the government will disclose to defense counsel "bad acts" by its witnesses known to the government, to the extent they exist. In the instant case, the government expects that some of its witnesses will acknowledge committing, or participating in, drug trafficking, firearms offenses, and violent acts. Under Rules 611 and 608(b), defendants are permitted to inquire into specific bad acts of a witness only if these acts are probative of truthfulness, and courts have precluded inquiry into such prior bad acts. *See e.g., United States v. Van Dorn*, 925 F.2d 1331, 1336 (11th Cir. 1991) (precluding defendants from cross-examining a cooperating defendant regarding "threats to witnesses and court officers, including a prosecutor and a federal judge, involved in his drug trafficking prosecution" as not relevant to a witness's truthfulness, among other reasons); *United States v. McNull*, 887 F.2d 448, 453 (3d Cir. 1989) (providing that a witness's "alleged solicitations of other inmates for criminal activities" did not suggest bias against the defendant and was not

probative of truthfulness); *United States v. Bentley*, 706 F.2d 1498, 1509-10 (8th Cir. 1983) ("We cannot say the activity in question here—a drug operation—is necessarily indicative of a lack of truthfulness under the standard imposed by rule 608."); *United States v. Fortes*, 619 F.2d 108, 117-18 (1st Cir. 1980) (providing that "[i]n refusing to allow cross-examination concerning Ward's possible involvement in the sale of cocaine, the district court observed that selling cocaine was not probative of truthfulness or untruthfulness," which was within the district court's discretion); *United States v. Young*, 567 F.2d 799, 803 (8th Cir. 1977) (disallowing cross-examination of government witness concerning her alleged offer to pay $10,000 to have her husband killed, because "the proposed question was not relevant to veracity and honesty and would have been highly prejudicial").

Accordingly, the government requests the Court preclude any cross-examination of a witness related to arrests or bad acts unrelated to truthfulness. In order to allow the Court to make the appropriate rulings, defendants should identify any arrest or "bad act" about which they intend to cross-examine a witness and demonstrate how that conduct is probative of truthfulness before propounding any question about the arrest or "bad act," all of which should occur outside the presence of the jury.

## XVI. PRECLUDE FORMS OF ARGUMENT OR EVIDENCE DESIGNED TO ELICIT JURY NULLIFICATION

The government moves the Court to preclude defendants from arguing or otherwise presenting evidence or pursuing lines of inquiry designed to elicit jury nullification. It is improper for a defendant to suggest in any way that the jury should

acquit defendants even if it finds that the government has met its burden of proof. *See, e.g.*, *United States v. Laguna*, 693 F.3d 727, 730 (7th Cir. 2012); *United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006); *Smith v. Winters*, 337 F.3d 935, 938 (7th Cir. 2003) ("A defendant has of course no right to ask the jury to disregard the judge's instructions ('jury nullification')."); *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly. Jury nullification is a fact, because the government cannot appeal an acquittal; it is not a right, either of the jury or of the defendant.").

Although the government cannot anticipate every form of "jury nullification" defendants may seek to inject, it moves to exclude the potential areas noted below, as well as any argument or questioning, no matter what its form, that, in effect, would "encourage a jury to acquit under any circumstances regardless of the applicable law or proven facts." *United States v. Anderson*, 716 F.2d 446, 450 (7th Cir. 1983).

## A. Government's Motivations for Investigating and Prosecuting the Case

Claims of selective or vindictive prosecution are irrelevant to the merits. *United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."). Whether and why certain individuals were charged or not charged is equally immaterial. *See United States v. Young*, 20 F.3d 758, 765 (7th Cir. 1994) (in a case involving a prohibited narcotics transaction, "[w]hether or not [a co-arrestee]

was criminally charged [did] not make the facts relating to [the defendant's] knowledge and participation in the attempted purchase more or less probable"); *United States v. Mosky*, No. 89 CR 669, 1990 WL 70832, at *1 (N.D. Ill. May 7, 1990) ("The government seeks to bar only any reference to its decisions regarding who to indict and for what acts. The government is correct that those decisions are not relevant to the charges faced by these defendants."). The subjective intentions or motivations of a government agent are also extraneous. *See, e.g., United States v. Goulding*, 26 F.3d 656, 667 (7th Cir. 1994) (noting that, even in the context of an entrapment defense, it was proper for the trial court to prohibit the defense from "mount[ing] an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant").

"In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *Armstrong*, 517 U.S. at 465 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). Accordingly, evidence bearing on the government's decision to prosecute is "extraneous and collateral" and, thus, properly excluded from trial. *United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming the exclusion of evidence offered to show that the "indictment was a political instrument"). To the extent defendant wishes to raise these issues, he must raise them with the Court, not the jury. *See United States v. Jarrett*, 705 F.2d 198, 204-05 (7th Cir. 1983) (finding claims of selective prosecution must be raised before trial);

*United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (finding that "the issue of selective prosecution is one to be determined by the court"). Defendants have filed no such motions. Accordingly, evidence and argument related to these issues, in any form, should be barred by the Court.

### B.    Allegations or Claims of Outrageous Government Conduct

The Court should also preclude any evidence or argument related to so-called "outrageous government conduct." The Seventh Circuit has repeatedly held that "[o]utrageous government conduct is not a defense in this circuit." *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011); *United States v. Boyd*, 55 F.3d 239, 241-42 (7th Cir. 1995) ("[t]he doctrine [of outrageous governmental misconduct] is moribund" (quoting *United States v. Santana,* 6 F.3d 1, 4 (1st Cir. 1993)) (second alteration in original)). Moreover, the issue of government misconduct is a matter of law for determination by the Court and must be raised in the form of a pretrial motion. *See United States v. Swiatek*, 819 F.2d 721, 726 (7th Cir. 1987) ("All of the circuits that have considered the question have held that the issue of outrageous government conduct is not a jury question.") (collecting cases).

Yet, there is a "tendency in criminal cases to try some person other than the defendant and some issues other than his guilt." *United States v. Griffin*, 867 F. Supp. 1347, 1347 (N.D. Ill. 1994) (quoting *Sears v. Romiti,* 50 Ill.2d 51, 277 N.E.2d 705 (1971)). In these types of cases, the "thrust of the defense is this: the prosecution was not nice or could have done it better and so the jury ought to acquit, whether or not guilt has been proved beyond a reasonable doubt." *Id.* at 1347. In the face of this increasing tendency to interject themes of "government misconduct" into a defense

strategy, courts have granted motions *in limine* "to bar defendants from presenting evidence or making arguments to the jury suggesting that they should be acquitted because the government engaged in misconduct in the course of its investigation." *United States Shields*, 1991 WL 236492, *3 (N.D. Ill. 1991); *see also United States v. Boender*, 2010 WL 811296, at *3 (N.D. Ill. March 3, 2010) ("The Seventh Circuit does not recognize an outrageous government conduct defense: the doctrine is more than moribund—it is stillborn because it never had any life; and it certainly has no support in the decisions of this court, which go out of their way to criticize the doctrine."); *United States v. Finley*, 708 F. Supp. 906, 913 (N.D. Ill. 1989) (granting motion *in limine* to preclude evidence "designed only to persuade the jury that defendants should be acquitted because the government engaged in misconduct during its investigation"). Accordingly, the government moves to bar the defense from introducing evidence or argument of outrageous government conduct.

## XVII. PRECLUDE THE "MISSING WITNESS" ARGUMENT

It is within the Court's discretion to prohibit argument concerning missing witnesses not under the control of either side. *United States v. Sblendorio*, 830 F.2d 1382, 1394 (7th Cir. 1987). "The reasons for not calling witnesses are so many and so complex—from . . . concern about the witness's appearance and demeanor to concern about the content of the testimony to a belief that the witness would invoke the privilege against self-incrimination—that a full exploration could take the trial far afield." *Id.* Thus, "when [a] witness is equally available to both sides, the preferred practice is to preclude the [missing witness] argument rather than to leave the jury free to speculate about a lot of non-evidence." *United States v. Simpson*, 974 F.2d 845,

848 (7th Cir. 1992). "The traditional position, limiting comment by judge or counsel to a witness under the control of the adverse party . . . is sound." *Id.* The government respectfully requests that the Court prohibit defendants from introducing evidence about, or arguing that any relevant inference can be drawn from, the fact that additional witnesses did not testify at trial.

The government's investigation included grand jury testimony by numerous witnesses, some of whom the government does not anticipate calling at trial. Nonetheless, the government produced to defendants the transcripts for these grand jury witnesses in discovery. Defendants, therefore, have the witnesses names and the opportunity to subpoena any grand jury witnesses for trial.

Alternatively, if the Court allows defendants to introduce evidence or argument regarding missing witnesses, the government seeks permission to respond appropriately. Ordinarily, a prosecutor may reply to "an argument by the defense that the absence of some witness counts against the prosecution" by highlighting that the defense has the same subpoena power as the government. *Sblendorio*, 830 F.2d at 1392; *see also United States v. Aldaco*, 201 F.3d 979, 988 (7th Cir. 2000) ("[I]t was not improper for the prosecutor to make clear to the jury that the defendant, like the government, has the power to subpoena any witness or witnesses relevant to the case after [the defendant's] counsel had opened the door to this reply argument by the prosecution.")

## XVIII.    LEAVE TO FILE ADDITIONAL MOTIONS

As the government continues to prepare for trial over the next six weeks, it anticipates that additional evidentiary issues, specifically issues unique to particular witnesses that the government learns during trial preparation, will arise requiring additional motions and rulings by the Court. For example, the government is not in a position to litigate individual complaints against law enforcement officers at this time because it has not yet made final decisions as to which law enforcement officers it will call as witnesses at trial and its review of complaints filed against police officers remains ongoing. Additionally, defendants have not yet disclosed any expert witnesses, which may necessitate additional government evidence and related motions *in limine*. As such, the government seeks leave of Court to file additional motions *in limine*, if necessary.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the government respectfully requests that this Court grant the government's motions *in limine.*

Respectfully submitted,

MORRIS PASQUAL.
United States Attorney

By:    <u>/s/*Caitlin Walgamuth*</u>
JASON A. JULIEN
ANN MARIE E. URSINI
CAITLIN WALGAMUTH
SEAN HENNESSY
Assistant U.S. Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated: August 25, 2023